IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) | **Criminal No.** |
| **v.** | ) ) | **1:21-cr-00314 (TFH)** |
| **SHAWN BRADLEY WITZEMANN,** | ) ) ) | |
| **Defendant** | ) ) | |

**DEFENDANT SHAWN BRADLEY WITZEMANN's**
**AMENDED SENTENCING MEMORANDUM**

Plaintiff Shawn Bradley Witzemann ("Witzemann") by undersigned counsel, hereby submits to the Court his Amended Sentencing Memorandum.   Defendant Witzemann separately moves the Court for leave to amend his Sentencing Memorandum and sets forth his reasons in that Motion. Defendant Witzemann separately moves the Court for leave to exceed any applicable page limits.

## I.   INTRODUCTION AND OVERVIEW

For expedience and closure, Defendant Witzemann pled guilty to a violation of 40 U.S.C. 5104(e)(2)(G) by "Parading, Demonstrating, or Picketing in a Capitol Building," which is Count IV under the First Superseding Information ("FSI").

> **40 U.S.C. 5104(e)(2)(G)**
> * * *
> **(e) CAPITOL GROUNDS AND BUILDINGS SECURITY.—**
> * * *
> **(2) VIOLENT ENTRY AND DISORDERLY CONDUCT.—**An individual or group of individuals may not willfully and knowingly—
> * * *
> **(G)** parade, demonstrate, or picket in any of the Capitol Buildings.
> * * *

Although there is a definition section to the statute, there is no statutory definition provided for "parading" or "demonstrating" or "picketing."  There is no statutory definition of "Capitol building" although it may be understood that the U.S. Capitol complex / campus includes many buildings other than the U.S. Capitol itself, and that the Capitol is also "a Federal building."

The U.S. Government, represented by the U.S. Attorney's Office for the District of Columbia ("USAO"), – one assumes after reviewing the evidence continually being compiled in more detail and what it could likely prove or not prove – knowingly negotiated and agreed to this plea deal, and agreed to thereby _dismiss_ essentially with prejudice against refiling:

    a. Count I alleging a violation of 18 U.S.C. §1752(a)(1) of _knowingly_ "Entering and Remaining in a Restricted Building or Grounds" _without lawful authority to do so,_

    b. Count II alleging a violation of 18 U.S.C. §1752(a)(2) of "Disorderly and Disruptive Conduct in a Restricted Building," and

    c. a redundant and duplicative Count III alleging a violation of 40 U.S.C. §5104(e)(2)(D) of "Disorderly and Disruptive Conduct in a Capitol Building."

As a result of the plea deal, Defendant Witzemann remains "innocent until proven guilty" and will never be charged again with, prosecuted, or ever convicted of Counts I, II, and III, provided that the plea deal is completed as agreed.  Thus, standing now before the Court, Witzemann is officially not guilty of any of the charges under Counts I, II, or III and will always be not guilty until the end of time. This is not simply presumed innocent pending trial.  There will never be a trial.  Witzemann will never be charged with anything other than Count IV until the sun burns out and the Earth dies, and beyond.  Never will Witzemann ever be guilty of Counts I, II, or III.

Nevertheless, the Government now seeks to punish Witzemann for allegations that the Government has dropped and for which he can never be prosecuted, as if he _were_ actually guilty of

those charges that have been dismissed and of which he is formally not guilty. It would sound as if the Government regrets its decision and is trying to have it both ways.

For example, near the top of page 17, the Government's Sentencing Memorandum ("GSM") – unmistakably repeating boilerplate language used in many if not all cases (not from Defendant's conjecture but from actual comparison by counsel among different cases) makes the truly remarkable claims that *(emphases added):*

> As they entered the Capitol, they ***very likely*** crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, ***they also may have observed*** extensive fighting between the rioters and police and smelled chemical irritants in the air.

Thus, here in this case, as in apparently every other January 6 related case brought for sentencing, the USAO would have this Court consider what is "**very likely**" and what defendants "**may have observed.**"

But these are criminal cases. The standard is that an accused is presumed innocent until proven guilty beyond a reasonable doubt. *See, e.g., Taylor v. Kentucky*, 436 U.S. 478 (1978).  The Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the charged criminal offense. *See, In re Winship*, 397 U.S. 358, 364 (1970). The burden to prove or disprove an element of the offense may not be shifted to the defendant. *See id*.; *see also Patterson v. New York*, 432 U.S. 197, 215 (1977).

So, there are no "maybes" in criminal prosecutions. No "maybe" can satisfy the standard of "guilty beyond a reasonable doubt." Throughout all January 6 related cases, the Government's reliance upon "maybes" and "could bes" and "possiblies" is prominent but legally unacceptable.

Throughout all aspects of the Government, as well as the Congress, the idea of actually proving individual guilt with probative evidence seems to have been abandoned as a quaint, forgotten

custom.  No effort is made to show that any particular defendant is actually guilty of a crime but merely that they are guilty by association, that is near to a crime.  (*Res Ispa Loquitur* is limited to civil litigation in only certain limited causes of action; it cannot be used in criminal prosecutions.)

It is of course the duty and constitutional role of federal judges and the courts to prohibit such erosion of due process and American jurisprudence.

Here, however, by the choice of the Government in negotiating and entering into a plea deal, the Government has dropped the charge under Count I under 18 U.S.C. §1752(a)(1) of *knowingly* "Entering and Remaining in a Restricted Building or Grounds" *without lawful authority to do so,*

Yet the GSM still wants to argue its view of Witzemann being guilty under 18 U.S.C. §1752(a)(1) nevertheless.  The Government chose not to put that allegation to evidence in a trial, but wants to simply pretend that it had gone through a trial and won.

The Government – overwhelmed it may be conceded by its discretionary choice to prosecute absolutely everybody instead of the normal practice of prosecuting only leaders or especially concerning defendants – and therefore employing boilerplate language disconnected to this Defendant or to most Defendants, seeks to argue the circumstances of *other people* who entered the U.S. Capitol, although Witzemann will never be prosecuted under 18 U.S.C. §1752(a)(1).

One might excuse the loose language for that reason, but even in cases where defendants are charged under 18 U.S.C. §1752(a)(1), the Government uses the exact same language indicating that the USAO does not actually know whether January 6 Defendants saw anything which would inform them that the normally public U.S. Capitol was on that day changed in legal status.  The entire substance is the same in theme as the explicit flashes of clarity expressed – in a criminal case – of what unspecified defendants "**_very likely_**" did and what those unspecified defendants "**_may have observed_**" thereby in the Government's view making Defendant Witzemann guilty of things he is not

4

even charged with.  "Maybe" is not consistent with criminal law. [1]

## II. FACTUAL CIRCUMSTANCES OF THE PLEA DEAL AND SENTENCING

Under the governing law, the Court should receive evidence, including as necessary an evidentiary hearing, to the extent necessary to establish any significant fact as necessary to sentencing.  *See* "Governing Law" section, *infra*.

### A. WITZEMANN ATTENDED THE JANUARY 6, 2021, PROTESTS IN HIS CAPACITY AS AN INDEPENDENT JOURNALIST

It is undisputed that Mr. Witzemann is an independent, opinion journalist and owner of Tribune Media International, LLC.  At all relevant times he operated a political blog and podcast.  *See* documents collectively attached as **Exhibits A, B, and C**.  The Government's report of Mr. Witzemann's background and of the events, though understandably engaging in the prosecution's advocacy, appears to concede all of these facts, though without the prosecutor's presuming his good will in the telling.

Leading up to January 6, 2021, Witzemann traveled from his home in New Mexico to Washington, DC to cover as an opinion journalist the President's speech at the lawfully permitted and peaceful rally held at the Ellipse (one area out of the national park known as the National Mall just South of the White House and North of the Washington Monument) and to report on any associated protests. *See* documents collectively attached as **Exhibit C**.

Unable to adequately cover the President's speech,[2] Mr. Witzemann left the event and walked

---

[1]     The USAO perhaps might wonder why it is frustrated in efforts to negotiate more plea deals, when it seeks to punish defendants for what they did not plead guilty to.  A criminal defense attorney would have difficulty recommending a plea under those circumstances.  Or perhaps offering a plea to a minor charge ought not be a camel's nose under the tent to other uncharged offenses.

back towards the Capitol to cover protests that had been scheduled and announced in December 2020 to occur later that day. *See* **Exhibit D**, December 2020 announcement of demonstration at the Capitol. Mr. Witzemann carried with him an iPhone (smart phone) equipped with a built-in video camera and ability to record video for the purpose of capturing the protests.  Mr. Witzemann arrived at the Capitol grounds well after a large crowd had already gathered there.  Witzemann then witnessed the events and activities. Mr. Witzemann was live-streaming reports of what he saw and offered his own narration of events for his audience. Mr. Witzemann described in his narration the protestors walking up the steps and climbing walls to get to the entrances of the building. He followed them inside to continue videoing the event as news.  *See* Witzemann Allocution Letter, attached as **Exhibit E**.

Mr. Witzemann entered the Capitol through an open doorway,[3] then followed the crowd through some of the building, including the Rotunda and Crypt areas and Statutory Hall.

During this time, Mr. Witzemann said to a Capitol policeman, "Brother, stand with us," which appears to be the entirety of the Government's complaint, allegation, and/or evidence of Witzemann "parading" or "demonstrating" or "picketing" in the U.S. Capitol.

---

[2]      Attendees report that the massive public address systems at the Ellipse rally included left and right banks of speakers which were out of synchronization, causing the left side and right side to interfere with each other, making it difficult for the crowd to understand what then President Donald Trump was saying. (*See, e.g.*, audio distortion heard at: "President Trump speaks to crowd on January 6 at the Ellipse," YouTube, https://www.youtube.com/watch?v=76w7RPLwYIs.)  This is in contrast with the news media's microphones and "media pool" feeds from the podium which present Trump's speech with perfect clarity from the microphones inches from Trump as he spoke.  President Trump's speech was not broadcast over local Washington, D.C. radio to the best of Defendant and his counsel's knowledge.  This appears to be one reason why many attendees departed the Ellipse early, while Trump was still speaking.

[3]      The Government Sentencing Memorandum speculates that from a window broken some distance away broken glass would have been in the doorway where Witzemann entered.  This conjecture is not explainable in terms of how the broken glass from the window would have traveled over to the door, for Witzemann to walk across the broken glass.  The Government's account is that someone else, possibly Hunter Ehmke, broke a window which allowed someone to open the door from the inside.  The Government accuses Ehmke of breaking apparently that same window at 2:15 PM.  *United States of America v. Hunter Ehmke*, Case No.  1:21-cr-00029-TSC-1., ECF Dkt. # 11.

It stands undisputed that Witzemann did not say or do anything to encourage or incite anyone to enter the Capitol or remain in it.  He was adopting the posture of a journalist as much as possible, although understandably affected by the larger-than-life events of large crowds.  He did not say or do anything to encourage or incite violence or destruction of property, and the only words he said inside or outside the building, aside from the comment to the police officer, were his narration for the video.

Mr. Witzemann's narration was not audible to anyone but at a normal spoken voice, captured by the microphone of his equipment.  Thus, his comments and statements could not be heard within the Capitol other than by someone perhaps standing next to him, but only remotely by those watching his broadcast from afar.

Mr. Witzemann thereafter exited the building, without personally causing any disturbance or damage to public property, nor encouraging, approving of, or inciting anyone else to do so. Mr. Witzemann did not enter any closed chambers or offices.  Mr. Witzemann did not take anything from the Capitol premises nor leave anything behind in it.

Also, it is undisputed that Mr. Witzemann complied with every request or order given to him by police officers inside and around the Capitol building. For example, after he had ascended the stairs to the top of the Inauguration stage bleacher under construction on the West side of the Capitol to get a better view filming the area as a journalist, Mr. Witzemann was directed by a police officer to return to the upper northwest terrace, and he immediately descended the stairs and returned to the upper northwest terrace in compliance.

Also, as can be seen in the photos and videos inside the Capitol, Mr. Witzemann stayed within the velvet ropes set up to guide visitors within the public hallways and public rooms of the Capitol, while viewing statues and other features while walking through the building. He never assaulted or threatened an officer or anyone else but was polite to all.

Contrary to the assertions of the Government that Mr. Witzemann should be punished for comments he made before and after the events of January 6, 2021, we would suggest that all such comments and observations made by Mr. Witzemann are protected speech under the First Amendment of our Constitution, and none, either alone or collectively, were such as to incite violence or destruction of property. He merely stated his opinions and beliefs.

On January 6, 2021, many journalists entered the U.S. Capitol Grounds and Capitol building to observe, document, and report on events occurring.

A major (that is, often cited) real-time video recording and also news magazine article resulting emphasized the journalist's view from inside the U.S. Capitol as events were unfolding on the afternoon of January 6, 2021.  *See*:  Luke Mogelson's, "A Reporter's Footage from Inside the Capitol Siege," The New Yorker Magazine, posted January 17, 2021, accessible at: https://www.youtube.com/watch?v=270F8s5TEKY&t=226s; also posted at The New Yorker the same day at https://www.newyorker.com/news/video-dept/a-reporters-footage-from-inside-the-capitol-siege.  These journalists who went into the U.S. Capitol among the crowds have been celebrated as they recorded the events as news and history from inside the building.

Laura Giesewiller of the *news crew for rent* company (a common feature of news in Washington, D.C., and New York City) "Keep in News Agency" was hired by a French television network.  The two-and-a-half hour almost continuous, unbroken (in the first two hours) video view from inside the U.S. Capitol was obtained by the U.S. Department of Justice from the French government, but it remains for no apparent reason hidden from public view under a protective order.[4]

_____

[4]     Produced by the USAO to defense attorneys with the name:  210107 LAURA USA CAPITOL WASHINGTON.mp4.  The raw news video was filmed by a professional, though independent, news crew within the District of Columbia and exists within the United States, including New York City. The Government claims that it cannot release the video to the public due to restrictions under its Mutual Legal Assistance Treaty (MLAT) with France, even though in fact the Government has the

Despite openly and proudly admitting to entering the U.S. Capitol, these journalists of course have not been charged with any crime by the Government.  They were physically present inside the U.S. Capitol performing their role as journalists under the First Amendment.

Likewise, it is undisputed and conceded that Defendant Witzemann is and on and about January 6, 2021, was, a citizen journalist observing, recording, and reporting on events at, around, and inside the U.S. Capitol on the afternoon of January 6, 2021, when the constitutionally commanded Joint Session of Congress was due to convene at 1:00 PM per statute and count the Electoral College votes of the States and applicable Territories (or District) and to review the votes, and hear and resolve objections to the validity of Electoral College votes.

Despite Witzemann's significant right to assert his First Amendment role as a news analyst or opinion journalist, he decided to resolve the Government's prosecution of him by pleading guilty to only one misdemeanor:  A violation of 40 U.S.C. §5104(e)(2)(G) for "parading," "demonstrating," or "picketing" inside a Capitol building.

Of course, 40 U.S.C. §5104(e)(2)(G) is constitutionally dubious as having no components different from other parallel statutes other than First Amendment protected activity, and also as being vague and ambiguous.  The constitutionality of 40 U.S.C. §5104(e)(2)(G) is in fact being challenged in other cases by other January 6 Defendants, but Witzemann pled guilty out of expedience and before being made aware of these concerns.  Because there are in fact parallel statutes explicitly addressing any disruption to events in the U.S. Capitol, 40 U.S.C. §5104(e)(2)(G) adds nothing but to criminalize the expressive components of "parading" or "demonstrating" or picketing.  Any non-First Amendment aspect of those actions are already covered by other statutes.  Therefore, all that remains is a direct and pure attack on the First Amendment by 40 U.S.C. §5104(e)(2)(G).

_____

authority to subpoena and obtain the news video directly within the territory of the United States.

**B.  WITZEMANN'S PREVIOUS ATTORNEY PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL**

Mr. Witzemann's previous attorney, Guy Womack of Womack & Associates, P.C., routinely exhibited a pattern of ineffective assistance of counsel by unduly influencing Mr. Witzemann to accept a plea agreement and associated statement of facts, wrongfully cutting and pasting factual information that did not apply to Mr. Witzemann from a sentencing memorandum that Womack had created for another defendant (**Exhibit F**), and, upon information and belief, improperly colluding with the Department of Justice (**Exhibit G**).

In an attempt to provide the Court with evidence of this improper collusion, Mr. Witzemann submitted an expedited Freedom of Information Act/Privacy Act (FOIA) request in the Executive Office for United States Attorneys requesting a copy of all communication from Womack and Womack & Associates, P.C. in reference to Mr. Witzemann's case in order to determine the full extent and nature of the communications.  *See* **Exhibit H**.  Mr. Witzemann requested all written and electronic communication (email, text messages, phone records) between Womack and Womack & Associates, P.C. with Christopher Amore, USANJ, Rebecca Magnone, NSD, and the U.S. Department of Justice regarding Mr. Witzemann's case.

Mr. Witzemann requested that his FOIA request receive expedited processing due to the risk of substantial loss of Due Process rights demonstrating a compelling need as outlined in the Fifth Amendment.  Further, his FOIA request was extremely limited to only the communications listed above and for the time period of April 10, 2021, through December 21, 2022.  Mr. Witzemann's FOIA request further explained that the privileged and confidential nature of the attorney/client relationship between Witzemann and Womack does not alleviate U.S. Department of Justice transparency requirements.  Nonetheless, his request for expedited processing was denied (**Exhibit**

**H**), and he has not yet received the communications he requested.

### III. SENTENCING RECOMMENDED BY SENTENCING GUIDELINES

Mr. Witzemann, by pleading guilty to it, and the USAO dropping all other charges, faces the penalty only for a single count of violating 40 U.S.C. § 5104(e)(2)(G), which provides for a maximum penalty of up six months of imprisonment and a fine of up to $5,000.

Defendant Witzemann requests as the Court's resolution of this matter that Witzemann,

1)  Complete one year probation as recommended by the presentencing investigation without any violation of law or any act of violence or angry confrontation, charged or uncharged, except if committed against him by another.  This does not include traffic or administrative infractions or offenses, including minor matters like business licensing, and should be precisely defined to avoid simply postponing proceedings.

2)  Pay restitution in the amount of the loss resulting from the offense.  The parties had agreed to $500, even though there may be no evidence of any loss caused by Defendant Witzemann.

3)  As part of his probation, officially apply for a formal press pass from the Congressional media office,

4)  As much as it depends upon Witzemann become officially registered as a working journalist with the Congress,

5)  Learn and become proficient in the rules of the U.S. Congress for properly covering news events in and around Capitol buildings and Congressional events according to Congressional expectations.

### A.  NO CRIMINAL HSTORY APPLIES

Under the U.S. Sentencing Guidelines, criminal history does sunset, with the timelines

depending upon the seriousness of the conviction.  The Government asserts a matter from 2005, which would put it outside of more than 15 years earlier than January 6, 2021.

> §4A1.2 - DEFINITIONS AND INSTRUCTIONS FOR COMPUTING
> CRIMINAL HISTORY instructs that
> * * *
> (e) APPLICABLE TIME PERIOD
> (1)  Any prior sentence of imprisonment exceeding one year and
> one month that was imposed within fifteen years of the
> defendant's commencement of the instant offense is counted.
> Also count any prior sentence of imprisonment exceeding one
> year and one month, whenever imposed, that resulted in the
> defendant being incarcerated during any part of such fifteen-year
> period.
> (2) Any other prior sentence that was imposed within ten years of
> the defendant's commencement of the instant offense is counted.
> (3) Any prior sentence not within the time periods specified
> above is not counted.
> * * *

If time-barred criminal history is not counted for more serious offenses under the formal Sentencing Guidelines, the Court should consider them time-barred for a Class B misdemeanor as well.  Accordingly, for the present purposes of sentencing, 0 points apply for Defendant Witzemann under the Sentencing Guidelines for past criminal history.

## B.  POINTS FOR "BASE" OFFENSE

The Government does not appear to assert a category under the Sentencing Guidelines for 40 U.S.C. § 5104(e)(2)(G), explaining in its March 4, 2022, letter:

> Your client understands that the sentence in this case will be determined by
> the Court, pursuant to the factors set forth in 18 U.S.C. 3553(a).  Your client
> further understands that 40 U.S.C. § 5104(e)(2)(G) is a class B misdemeanor,
> as defined by 18 U.S.C. 3559(a)(7).  Accordingly, pursuant to 1B19 of the
> United States Sentencing Commission, Guidelines Manual (2018), the
> sentencing guidelines do not apply to your client's sentencing.

However, if the Court might find useful standards in the Guidelines, it would appear that the only plausible category would be for "trespassing" for a base offense level of 4 points.

Although the charge is for "parading," "demonstrating," or "picketing," there are other parallel statutes which address any sort of actual disruption or damage or violence in the Capitol or any federal building.  Thus, we must consider only the kind of "parading," "demonstrating," or "picketing," which is in and of itself *NON-DISRUPTIVE*, non-violent, and not harmful in itself.  Again, other statutes address those types of actions, such as 17 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); 18 U.S.C. § 1752(a)(4); or 18 U.S.C. § 5104(e)(2)(F).

## C.  REDUCTION FOR COOPERATION

If the Court were to consider the Guidelines for information, the Defendant's pleading guilty and cooperation would cause a 2-point reduction.  The Government notes that Witzemann contacted the FBI on his own initiative and volunteered to provide an interview and information.

## D.  RESULTING POINTS

If the Court were to consider the Guidelines as informational, the points that would be assigned under the Guidelines would be 2.  Therefore, a sentence of 0 to 6 months in jail (the maximum for the offense in any event) would be allowable.

Pursuant to the U.S. Sentencing Guidelines, Defendant Witzemann's admitted misdemeanor offense is within the "Zone A" that includes "Offense Levels" of 1 through 8.  The recommended sentence is zero (0) to six (6) months regardless of whether the Offense Level for Witzemann is anywhere between 1 to 8.  The governing statutes and the Sentencing Guidelines allow for only probation only where – as here -- a sentence of 0 months is recommended or permissible.

## E.  ALTERNATIVE PENALITIES

The Court is authorized to substitute community service, a term of probation, and/or home detention of no more than the maximum allowed for incarceration.

## F.  FINE

The Court is authorized by the statutory offense to impose a fine of up to $5,000.

## IV. RECOMMENDED SENTENCING UNDER 18 USC 3553(a) FACTORS

Again, the Government notes in its March 4, 2022, letter:

> Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. 3553(a). Your client further understands that 40 U.S.C. § 5104(e)(2)(G) is a class B misdemeanor, as defined by 18 U.S.C. 3559(a)(7). Accordingly, pursuant to 1B19 of the United States Sentencing Commission, Guidelines Manual (2018), the sentencing guidelines do not apply to your client's sentencing.

As asserted by the USAO, the Court will consider the factors under 18 U.S.C.§ 3553(a) in crafting a sentence that is clearly at the low end of the sentencing range. These factors of that statute include:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed—
>
> > (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B)    to afford adequate deterrence to criminal conduct;
> > (C)    to protect the public from further crimes of the defendant; and
> > (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Yet again the USAO is confused. "The offense" referred to in 18 U.S.C.§ 3553(a) here is 40 U.S.C. 5104(e)(2)(G) of "Parading, Demonstrating, or Picketing in a Capitol Building,"

The USAO wants to analyze "the nature and circumstances" of offenses which Defendant Witzemann did not commit, is not guilty of, and which form no part of what is currently before the Court now. The USAO wants the Court to sentence other people who are not before this Court in this case.

a. The "nature … of the offense" concerns "the offense" of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building."

b. The "circumstance of the offense" concerns "the offense" of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building."

c. The need for the sentence imposed "to reflect the seriousness of the offense" concerns "the offense" of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building."

d. The need for the sentence imposed "to promote respect for the law," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building."

e. The need for the sentence imposed "to provide just punishment for the offense," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building."

f. The need for the sentence imposed "to promote respect for the law," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building."

g. The need for the sentence imposed "to afford adequate deterrence to criminal conduct," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building."

h. The need for the sentence imposed "to protect the public from further crimes of the defendant," concerns "the offense" of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building."

The USAO cannot "smuggle" irrelevant issues into the case, of which the Defendant is not

guilty and never will be guilty, until the end of time.

Out of 10,000 demonstrators (as estimated by the U.S. Capitol Police), there are people who damaged Federal property.  Witzemann, however, did not.

Out of 10,000 demonstrators, some people committed violence.  Witzemann, however, did no such thing.

Out of 10,000 demonstrators, there are people who scuffled with police or worse, many even assaulting or battling with police officers.  Witzemann, however, did not.

Out of 10,000 demonstrators, there are people who are charged with disrupting the Joint Session of Congress that recessed at 2:18 PM according to the Congressional Record (2:13 PM according to the testimony of then-Parliamentarian Wickham and 2:00 PM according to the official after-action timeline report of the U.S. Capitol Police).  Witzemann, however, did not.

The GSM erroneously makes the wildly-false claim that:

> Witzemann's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours.

There is not a shred of truth to this statement.  Witzemann's actions did no such thing. Moreover, Witzemann had no "fellow rioters" as there has been no suggestion of any coordination between Witzemann and anyone else.  Under American jurisprudence, the USAO and the Court cannot transfer the actions of "fellow rioters" to Witzemann.  What becomes of the Sixth Amendment constitutional right to confront his accusers if Witzemann is accused of what unspecified, unidentified others did?

Therefore, the Court should evaluate, analyze, and apply the factors as follows:

a.   The "nature … of the offense" under 40 U.S.C. 5104(e)(2)(G)

Witzemann contends that it is quite common for journalists to be positioned

16

between the two sides in a tense situation, the better to video or photograph or see what is going on and police are often very aware and accepting of this. However, sometimes that can increase the risk of journalists being hit by one side or both.

Acting as a citizen journalist, Witzemann peacefully followed others into the U.S. Capitol, observed what was happening and reported on those events as a citizen journalist over the internet. He committed no harm, damaged nothing, complied with police instructions, interfered with nothing and no one and no official, and peacefully exited. The only allegation of the Government against him is that he peacefully commented to a police officer "Brother, stand with us."

Earlier on the West side lower level, Defendant Witzemann engaged in friendly and casual conversation with police officers (one female officer seen on photographs), "Please, please, please don't start shooting lead." The reference to lead was not a flippant term but in reference to the fact that the police were already shooting pepper balls and flash bangs and perhaps rubber bullets. So Witzemann believed that if the situation turned to actual bullets things were going to really get out of control.

Approximately an hour before Witzemann entered the Capitol building and then made the "Brother, stand with us" statement to three police officers, Defendant Witzemann watched Eric Derickvargo be pushed by a police officer off of the upper West-side terrace, causing Eric Derickvargo to fall approximately two stories to the lower West-side terrace or the adjoining grassy area. Therefore, by the time Witzemann had the "Brother, stand with us" conversation the potential for violence was well understood by him and he thought by everybody else on the scene. That was assumed as a backdrop for his comment.

17

However, in too many aspects of these January 6 cases, there is a lot of assuming going on.  So, the GSM assumes that "Brother, stand with us" was an appeal to the police officers to abandon their jobs and join the protestors.  But in a criminal case, "Brother, stand with us" can just as easily be interpreted as an appeal to de-escalation and peace and avoiding a situation spinning out of control.  While it might sound a little over-dramatic, in terms of understanding the principle accurately, it might not be entirely unlike the famous man walking home in Tiananmen Square carrying bags of groceries who turned and stood in front of a Chinese Red Army tank in 1989.

The GSM argues that others on January 6 – not Witzemann – "threatened the peaceful transfer of power after the presidential elections."

However, no power is transferred on January 6 every four years.  The votes of the Electoral College are counted and reviewed, and objections are heard and decided on January 6, pursuant to the XIIth Amendment to the U.S. Constitution.  No power is transferred.

On January 20, power is transferred pursuant to the XXth Amendment every four years.  But that power is transferred automatically by operation of law, as planet Earth spinning on its axis causes the local time on Washington, D.C., to strike Noon.  It is the time reaching Noon that transfers presidential power from one President to the next.  A President's term ends at Noon.  The next President's term begins.

No one can threaten the transfer of presidential power, nor stop it.

Our Founders were intelligent in creating this inevitability.

On January 6, 2021, some of the 10,000 demonstrators estimated by the U.S.

Capitol Police to be at or around the Capitol did turn into rioters.  Such lamentable

misconduct has been a sad feature of mass demonstrations for over 200 years.  Large

areas of Washington, D.C. were burned in the 1960s during civil rights riots.  Vietnam

war protests were marked by periodic outbreaks of violence.  The "Battle in Seattle" in

1999 and World Trade Organization protests were marked by violence.  Recently the

"yellow jacket" riots in France exhibited violence.  Civil War ruled the streets of many

U.S. cities from 2014 through 2020.  This is the nature of what other people did on

January 6 as well.  Largely peaceful demonstrations can include those who commit

violence.

But Witzemann took no part in any of that.

If 20,000 soccer fans watch a controversial match, and 500 soccer hooligans

have a brawl, are the other 19,500 soccer fans sitting in their seats and peacefully

watching the game as guilty as the 500 soccer hooligans?   The USAO desperately

hopes that the Court, the media, Congress, and the public will make the mistake of

falling for such malarkey.  U.S. law is not so barbaric and backward as to fail to

distinguish between those who rioted ***and those who did not.***  So, why are prosecutors

so insistent in blurring the lines and erasing any difference?

b. The "circumstance of the offense" under 40 U.S.C. 5104(e)(2)(G) are that events at

and in the U.S. Capitol were highly important and newsworthy, and as a citizen

journalist Witzemann covered these events because of their seriousness and

significance.  Furthermore, the USAO has grossly mischaracterized the circumstances,

hysterically aided and abetted by the news media and the entire political class, as

explained *infra.*

c. For the sentence imposed "to reflect the seriousness of the offense" under 40 U.S.C. 5104(e)(2)(G) – especially since there is no evidence whatsoever of Witzemann parading, demonstrating, or picketing in reality – justifies the recommended and requested sentence.

d. For the sentence imposed "to promote respect for the law," justifies the same.  To punish Witzemann for things he did not do would only breed disrespect for the law and the judiciary and would not encourage compliance with would seem unjust.

e. For the sentence imposed "to provide just punishment for the offense," justifies the same.

f. For the sentence imposed "to promote respect for the law," justifies the same.

g. For the sentence imposed "to afford adequate deterrence to criminal conduct," justifies the same and in addition if within the power of the Court Witzemann obtaining training from the Congressional press officials on how to officially qualify as a journalist authorized to enter the U.S. Capitol as did other officials like the New Yorker's Luke Mogelson and on the procedures and rules for journalists in reference to the U.S. Capitol, and that Witzemann apply for an official press pass.

For example, the Government argues on GSM page 20 under "General deterrence"

> General deterrence is an important consideration because many of the rioters intended their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have:  the peaceful transfer of power to a newly elected President.

Of course, what "***many of the rioters intended***" is completely irrelevant to Defendant Witzemann.

The attitude of the Government that it can punish Defendant Witzemann for what "***many of the rioters intended***" is far more serious and frightening than any of the misconduct of some demonstrators who rioted on January 6, 2021.

And, again, as noted elsewhere, no power is transferred to a newly elected President by the quadrennial January 6 counting – and disputes over – of Electoral College votes.  Power is transferred to a newly elected President on January 20 every four years by the clock striking Noon.

A neutral, unbiased decision-maker should be concerned by the quality of the Government's arguments and the attempt to engage in guilt by association and engage in collective guilt.

h.  The need for the sentence imposed "to protect the public from further crimes of the defendant," justifies the same, especially given the lack of any cognizable criminal history of this Defendant

This is not an invitation to engage in wild speculation about what a Defendant might do.  At worst, this factor would consider that Witzeman might again "parade, demonstrate, or picket."

The factors include consideration by the Court of "the Nature and Circumstance of the Offense" -- that is, parading, demonstrating, or picketing – which the Government asserts to include the following.  Defendant by counsel finds the phrasing to be aggressive "spin" and severely doubts that many of these factors are valid for the Court to consider, but nevertheless:

(1)  Whether, when and how the Defendant entered the Capitol building.

Discussed in detail elsewhere.  *See* Exhibit E.

(2)  Whether the Defendant encouraged violence.

21

No, Witzemann did not.

(3) Whether the Defendant encouraged property destruction.

No, Witzemann did not.

(4) Defendant's reaction to acts of violence or destruction.

Witzemann recorded these events as a journalist, however rejects that he is required to function as a law enforcement officer.

(5) Whether, during or after the riot, the defendant destroyed evidence

Initially, of course, the destruction of evidence is not a crime nor wrongful unless done to obstruct justice. For example, almost all evidence concerning January 6, 2021, was recorded on small, portable electronic devices of very limited storage capacity. The Government would have to prove beyond a reasonable doubt that a person did not routinely free up needed space on limited devices. That is, the phrasing is misleading.

Witzemann of course has not been charged with destruction of evidence, even before entering into a plea deal.

While Witzemann has no first-hand knowledge of a riot, as reported by others in a few very small parts of the Capitol, it is undisputed that his activities and goals were to *gather* information in the form of news recordings to be broadcast as news. Witzemann not only preserved all the evidence he had, but he created such evidence by systematically recording the events as news. Witzemann voluntarily contacted the FBI and provided all the information he had on his own initiative.

(6) The length of the Defendant's time inside of the building and exactly where the

defendant travelled.

As a journalist French reporter Laura Giesewiller spent two hours continuously recording an uninterrupted record of events inside the Capitol. Witzemann recorded the news events for about half of that time. Counsel doubts the relevance of this factor, but on the contrast argues that this severely undercuts the Government's entire argument about January 6. The Government argues that most demonstrators were in the Capitol for a very short amount of time, and Witzemann at an hour strikes the Government as a long time. This damages the Government's theories that (a) the impact of demonstrators was significant or that (b) the demonstrators had any intention of remaining in the Capitol. If most Demonstrators spent about 20-30 minutes inside the Capitol before leaving, then they had no plan, goal, or intention of disrupting anything in Congress or attacking the Capitol or anything of the sort. Here, Witzemann recording news events for a little over one hour is actually a very short length of time of no significance to the events of January 6, 2021.

Counsel rejects the idea that "exactly where the defendant travelled" is a factor the Court should consider, as apart from a defendant actually doing something that is wrongful. Merely travelling somewhere – differently from conduct – is not a relevant factor.

(7) The defendant's statements in person or on social media.

The Court would be violating the U.S. Constitution by considering such a factor, just as the Government has already violated the U.S.

Constitution by asking the Court to consider it.

(8)  Whether the Defendant cooperated with or ignored commands from police

officers.

It is undisputed that Witzemann complied with police officers'

directions.  The Government's complaint that Witzemann calmly said to a

police officer "Brother, stand with us" demonstrates by its great weakness

that the Government has no basis for any allegation of this type against

Witzemann.  The Government might have been better served simply not to

mention that at all.

(9)  Whether the Defendant demonstrated sincere remorse or contrition.

Again, the Defendant on his own initiative volunteered to meet with

and cooperate with the FBI in these matters.

Remarkably, but tellingly for the quality of the Government's arguments, the GSM

claims on the bottom of page 17, top of page 18, that:

> Had Witzemann personally engaged in violence or destruction, he would be
> facing additional charges and/or penalties associated that conduct.  The
> absence of violent or destructive acts on Witzemann's part is therefore not a
> mitigating factor in misdemeanor cases.

This is nonsense of course.  It is telling that for the USAO, violence or destruction is a

factor for sentencing only if present, but the Defendant's guilt is to be presumed if not present.

## V.  WHAT THE COURT MAY NOT CONSIDER

Probably half of the GSM is irrelevant to this case and indeed improper for many reasons.

Here, Defendant Witzemann has pled guilty only to 40 U.S.C. 5104(e)(2)(G) "Parading,

Demonstrating, or Picketing in a Capitol Building."

**That is all that Witzemann stands guilty of** (by admission).

And that is all that Witzemann will ever be considered guilty of, because the plea deal forecloses any other of the hastily-drafted charges that The USAO rushed into court.

Therefore, it is not merely Witzemann's opinion that he is guilty of nothing else.  It is the official proceeding and procedural posture before the Court as now the "law of the case."

Yet the prosecution team seems to have lost track of the very limited, narrow focus of what should remain of the case, and is trying to "smuggle" other issues into the proceedings.

That is, the Defendant pled guilty to one thing, but now instead the U.S. Department of Justice ("DoJ") wants this Court to sentence him for something(s) entirely different, not what he pled guilty to.  The plea deal becomes a "bait and switch" situation.  Having entered into a compromise, The USAO wants to pretend it did not, and to impose a more serious sentence than is warranted.  The GSM addresses acts by other people, that Witzemann did not commit, and seeks to blame Witzemann for what other, often unspecified people did, or the actions of "the crowd" in general.

## VI. WHAT THE COURT MAY NOT CONSIDER:  FIRST AMENDMENT CONSTITUTIONALLY PROTECTED ACTIVITY

Defendant Witzemann does not stand charged with Thought Crimes, unapproved thoughts, unauthorized political expressions, or socially undesirable political views.  He has not been called before the Orwellian Ministry of Truth.  Yet the Government asks this Court to punish Defendant for his exercise of free speech guaranteed to him by the First Amendment to the U.S. Constitution.

The Supreme Court's decision in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) illustrates the compelled speech doctrine.  In now hallowed language in our national laws, Justice Robert H. Jackson asserted,

> "If there is any fixed star in our constitutional constellation, it is that no
> official, high or petty, can prescribe what shall be orthodox in politics,
> nationalism, religion, or other matters of opinion or force citizens to
> confess by word or act their faith therein."

Chief Justice John G. Roberts Jr. reiterated the essence of the compelled speech principle in

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47 (2006):

> "Some of this Court's leading First Amendment precedents have
> established the principle that freedom of speech prohibits the
> government from telling people what they must say."

This Court – even on a guilty plea – could not consider the race of a Defendant during

sentencing.  ***Neither*** can the Court consider the exercise of the Defendant's Constitutional rights of

free speech, petitioning the government for redress of grievances, free association, and travel.

Unmistakably, the Government's widespread and persistent efforts to silence political

opinions different from those held by the U.S. Attorney and the Attorney General is far more

disturbing and dangerous to the country than anything that happened on January 6, 2021.

Yet clearly The USAO is trying to accuse Witzemann of holding different political views than

the staff of the U.S. Department of Justice ("DoJ"), of saying things they don't like and which they

hope the Court will dislike.  In doing so, the DoJ has already violated the U.S. Constitution and 42

U.S. Code § 1985(3) and 42 U.S. Code § 1986.

It would be a constitutional violation for the Court to punish Witzemann for the exercise of his

Constitutional rights, even as it is already a violation for The USAO to ask the Court to do so.

The "central meaning" of the First Amendment, Justice William Brennan declared in his

opinion for a unanimous Court, **is the right to criticize government and public officials.**  *New York*

*Times v. Sullivan*, 376 U.S. 254 (1964).

If the USAO got the idea that these January 6 prosecutions are about silencing criticism of

government officials, they misunderstood.

The entire section of the GSM starting on page 13 is an attack upon the First Amendment and it would be a violation of the U.S. Constitution for the Court to consider the Defendant's expressions of his political beliefs as recounted in the Government's tone-deaf argument.

The GSM wants the Court to punish Witzemann more severely because *(emphases added)*:

- "Witzemann ___sympathized___ with the Proud Boys and others protesting against the lawful 2020 elections."  (GSM Page 21)

- "Witzemann … acknowledged ___his sympathy for___ the Proud Boys movement." *Id.*

- "Witzemann … seemed to justify his presence in the Capitol Building ___by asserting his position as a journalist___." *Id.*

- "In the months after January 6, 2021, he continued to promote ___his belief___ that the election was stolen."  *Id.*

- "as recently as August 2021, he described the events of January 6, 2021 [as] a 'caricature of the truth.'" *Id.*

- Witzemann "___believes___ that 'hundreds' have been 'rounded up and charged with crimes they did not commit.'"

Clearly, the Court can no more consider such exercises of Witzeman's First Amendment rights than it could punish Witzemann for being of a certain race.  On the contrary, 42 U.S.C. 1985(3) ("for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;") and 42 U.S.C. 1986 to order an investigation and proper legal action for the overwhelmingly clear and obvious efforts of the USAO to deprive Witzemann and hundreds of others of their First Amendment rights.

## VII.   WHAT THE COURT MAY NOT CONSIDER:  CROWD LIABILITY

Hundreds of people out of the crowd of 10,000 committed violence against people and things, battled with police, injured about 140 police officers, damaged federal property at the Capitol, and some even tried to break through the doors to the Senate and House chambers.

However, here, in this case, the security camera video – that is, the Government's own evidence – shows with unmistakable clarity and precision that most of those who intruded into the U.S. Capitol building clearly had no plans whatsoever, no sense of direction, no commonality, etc. [5]

"Crowds" do not say things.

Individuals say things.  Crowds do not.

Crowds do not do things.

Individuals do things.  Crowds do not.

But the U.S.A.O.'s entire approach to the events of January 6, 2021, are contrary to law and unconstitutional, seeking to treat individual Defendants as members of a crowd.

> This is where things fall apart. Although both Governor DeSantis and Sheriff Williams argue that the phrase "willfully participate" is commonly understood, neither party offers an actual definition. Is it enough to stand passively near violence? What if you continue protesting when violence erupts? What if that protest merely involves standing with a sign while others fight around you? Does it depend on whether your sign expresses a message that is pro- or anti-law enforcement? What about filming the violence? What if you are in the process of leaving the disturbance and give a rioter a bottle of water to wash tear gas from their eyes?

> The Governor would have this Court pencil in an exception for a person who merely "attend[s]" a violent demonstration but does not actively engage in violence or conduct that poses an imminent risk of injury or property damage. ECF No. 99 at 13. But the Governor offers no explanation or construction that limits when mere attendance becomes participation, except that a person must

---

[5]      *See,* Capitol Security camera video, produced by USAO as 7029 USCS 02 Rotunda Door Interior-2021-01-06_15h15min01s000ms.mp4 from USCP OPR Report 21-007, Exhibit 6 CCTV Recordings, from production DT_DocID: USCP-003-00000167, produced 11/18/2021, in Global Production DOJCB_008

"intend to commit violence." Id. But this ignores the plain text of the statute, which separates a person from an assembly of three or more persons sharing that intent. See *infra*.

*See, The Dream Defenders, et al., v. Ron DeSantis, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9, 2021), (Mark E. Walker, Chief United States District Judge),* Page 53 *(injunction against anti-riot law in part because the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts of others)*, attached as **Exhibit I**.  And continuing:

> If this Court does not enjoin the statute's enforcement, ***the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians***. This violates the First Amendment. See, e.g., *Bible Believers v. Wayne Cnty.*, Mich., 805 F.3d 228, 252 (6th Cir. 2015). Florida's interest in preventing public violence is beyond question, but when that interest collides with rights guaranteed by the First Amendment, the "government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are delicate and vulnerable, as well as supremely precious in our society," may be suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and eviscerates that essential breathing space. The law is overbroad.[27]

> Accordingly, I conclude that Plaintiffs have established a substantial likelihood of success on the merits as to their overbreadth claim.

*Id.,* at Page 77 *(emphases added)*.

In other words, if Witzemann attended a football game with 40,000 of his fellow fans in the stadium, but about 100 of them get into a brawl requiring police intervention and arrests, are all 40,000 people present in the stadium part of the brawl or riot?

The current government under the current Attorney General U.S. Attorney strongly and energetically believes yes.

Also, the GSM erroneously, tellingly, and fatally proclaims near the bottom of Page 2:

> "The Court must also consider that Witzemann's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings."

However, this Court must emphatically ***NOT*** consider any such nonsense and must reject it as

a violation of Due Process and the Sixth Amendment and repugnant to centuries of Anglo-American Jurisprudence.  The Defendant is not charged with any conspiracy with any other person.  The Defendant is guilty only of his own individual conduct.  No U.S. citizen can be guilty of the "context" of what other people did.

Collective guilt and collective punishment are considered war crimes under international law.[6]

Under U.S. criminal law, the prosecution has the burden of proving beyond a reasonable doubt each element of a crime that an individual has committed.  The careless transfer of the actions of "crowds" or "others" to specific defendants is an attack upon Due Process and the burden of proof of proving the elements of a crime beyond a reasonable doubt.

The record is devoid of any fact which would enable the DoJ to pre-emptively tar a group of people.  Even The Freedom of Association is a guaranteed right under the U.S. Constitution.  *See, e.g., NAACP v. Alabama*, 357 U.S. 449 (1958).  Even a political organization's membership is constitutionally protected under the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d 1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179 (D.C. Cir. 2003).

In no way did members of any riot rely on numbers.  If the Government could allege a conspiracy, it would have done so.  But it did not.  And now it never can.  There was no reliance or inter-connection.   The sloppy accusations of the Government suggest counter-factually that participants got together and planned out their numbers ahead of time.  In fact, though, nobody knew how many numbers of people there would be on January 6, 2021.  Most significantly, Defendant Witzemann had no control or influence over how many people there would be in or near the U.S.

---

[6]      Shane Darcy, "Prosecuting the War Crime of Collective Punishment: Is It Time to Amend the Rome Statute?," Journal of International Criminal Justice, Volume 8, Issue 1, Pages 29–51, March 2010, February 1, 2010, https://doi.org/10.1093/jicj/mqp083.

Capitol.  There was no tacit agreement that if I show up and add 1 more person to the 10,000 estimated by the U.S. Capitol Police to be present, then you will misbehave.

Such a plan of concerted action is of course possible.  Anti-Kavanaugh protestors did exactly that in September of 2018, openly and publicly arranged and proudly admitted.  For this they received a $50 fine.  (Technically bail in the amount of $50, but the charges were later dropped.)

Yet no such plan or arrangement can be claimed here concerning Witzemann.

## VIII.  FACTUAL CIRCUMSTANCES – DARKLY MISCHARACTERIZING THE CAPITOL

To set up its sentencing argument, the Government seeks to set up the issues to be decided here with misinformation.  The Government attempts to present these matters as if the U.S. Capitol is a secret, underground, nuclear missile base, rather than a citadel of democracy – meaning the meeting place between citizens and their elected representatives.

Of course, there is no excuse for political violence, such as witnessed since 1999 and especially from 2014 through 2020, and especially directed against law enforcement.

Neither is there any excuse to refuse to distinguish between those who committed violence on January 6 in or near the Capitol ***and those who did not.***

Nevertheless, the U.S. Capitol and its massive Grounds – a public, national park – are presumptively and normally open to the public and have traditionally been the site for well over a century of many small and large public demonstrations exercising the right of free speech and the right to petition the government for the redress of grievances as is the right of all citizens guaranteed by the First Amendment to the U.S. Constitution.

As Federal courts in this District have reasoned in reaching legal conclusions:

> ***The Capitol Grounds*** (excluding such places as the Senate and House floors, committee rooms, etc.) ***have traditionally been open to the public***; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added)*.

> The courts in this jurisdiction have long recognized that ***"[t]he United States Capitol is a unique situs for demonstration activity"*** and ***"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,*** [a fact which must be weighed] against the government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) (*quoting Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S. Ct. 311, 34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added)*.

So very public is the Capitol, that built into the physical building from its initial construction are public viewing galleries allowing any member of the public – for no reason other than a desire to watch their Representatives and Senators at work – may sit and watch the House of Representatives and the U.S. Senate while in session. [7] [8]

There is no physical barrier – even to this day – between the Chambers in session and the public watching from the balcony galleries.  If a member of the public wished to – not advisable, of course – toss a candy bar down to his willing U.S. Senator, the physical structure of the Senate chambers would make that possible.

No greater message of the very public nature of the Capitol can be found than the very

---

[7]     See:  Large Public Galleries in New Legislative Chambers, Library of Congress exhibit, https://www.loc.gov/exhibits/uscapitol/s5.html :  Thomas U. Walter. "Details of Gallery in Hall of Representatives," 1856. Ink and water color on paper. Architect of the Capitol (204)

[8]     This is changed only in the sheer quantity of citizens in our growing nation and the number of persons who want to watch from the viewing galleries, leading to time limits for rationing.  But the public purpose of the U.S. Capitol has been set since the first construction blueprints were drawn.

architecture of the building designed as a meeting place between citizens and their leaders.

The Government persistently diverts attention with its claim that the Capitol is "secured" 24 hours a day, 7 days a week.  However, "secured" does not mean "closed."

The museums of the Smithsonian Institution are "secured 24 hours a day, 7 days a week" yet open to tourists from around the world in the millions, subject to the protection of its Office of Protection Services, during business hours.

Not only are the Capitol Grounds a national park, but the Capitol building is in fact a museum in which hangs some of our nation's most iconic and important historic art, such as the nation's historic paintings[9] of the --

- Signing of the Declaration of Independence
- Surrender of General Burgoyne
- Surrender of Lord Cornwallis
- General George Washington Resigning his Commission
- Landing of Columbus
- Discovery of the Mississippi
- Baptism of Pocahontas
- Embarkation of the Pilgrims

The Capitol building is 751 feet long,[10] and the size of a small ocean-going cruise ship.  The Congress routinely conducts its business with hundreds of (maybe a thousand) journalists, visitors – even tours of school children (not always known to be quiet) – lobbyists, government officials, etc. present in the building while committee hearings are held, each House is in session, meetings are held throughout the building, etc.  The Government would have us imagine that the mere presence of any member of the public in the 751-foot-long building is a debilitating crisis, overlooking the hundreds of visitors who are present in the U.S. Capitol at all times, every hour of every business day.

---

[9]     https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/rotunda
[10]    Architect of the Capitol, https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building

## IX. AVOIDING UNDUE DISPARITIES IN SENTENCING:  COMPARISONS:  WHAT ARE NORMAL PUNISHMENTS FOR COMPARABLE BEHAVIOR?

### A.  DISPARITIES WITH 2017 TRUMP INAUGURAL RIOTS

Based upon comparable events in recent memory, to avoid sentencing disparities, the Court should drop all the charges as the DoJ did after the massive insurrection, arson, and riots held on January 19-21, 2017, to protest the inauguration of Donald Trump as President.

In January 2017 in the nation's Capital, an estimated 2.6 million Left-wing and anarchist protestors demonstrated their fury at former Democrat Donald Trump.   Several thousand of those demonstrators engaged in arson, assaults on police, vandalism, and rioting, including burning hundreds of cars and businesses with Molotov cocktails.



Some stores were boarded up for months afterwards.  Yet the DoJ dropped the charges against these violent rioters and insurrectionists.  *See* **EXHIBIT J**, attached.

### B.  DISPARITIES WITH 2018 ANTI-KAVANAUGH RIOTS

Based upon comparable events in recent memory, the Court should assess a $50 fine upon Defendant Witzemann as the DoJ did just recently in September 2018, when anti-Kavanaugh protestors publicly and openly conspired to obstruct the official proceedings of the U.S. Senate Judiciary Committee in an attempt to prevent the confirmation of Brent Kavanaugh to the U.S. Supreme Court.  The rioters inside the U.S. Senate Judiciary Committee hearing room and occupying the Hart Senate Office Building were released within hours on a $50 bail bond.  Then the charges

were dropped against most of the rioters.  *See* **EXHIBIT K**, attached.

### C.  DISPARITIES WITH 2020 ANTI-TRUMP RIOTS ATTACKING THE WHITE HOUSE

Based upon comparable events in recent memory, the Court should drop the charges and award large financial windfalls to Defendant Witzemann, as the DoJ did with the insurrection, arson, riots, and attack on the White House in May and June 2020.  The charges were dropped against most of the rioters, and they were paid large sums in settlement of their lawsuits.  *See* **EXHIBIT L**, attached.

In 2011, similarly, Left-wing rioters entered and physically occupied the Wisconsin State legislature, followed by months of disruptive protests mostly outside but also inside the Capitol building of Wisconsin.[11]  Those who sought to obstruct official proceedings to prevent the passage of legislation they disapproved of were mostly not arrested or given minor fines or probation.

### X.  GOVERNING LAW:

Federal law codified at 18 U.S.C. § 3553 "Imposition of a Sentence" authorizes a federal court to impose a sentence upon the conviction of a defendant for a crime, including by a plea of guilty, in accordance with that statute's terms and the guidelines promulgated by the U.S. Sentencing Commission under its authority at law.

The U.S. Sentencing Commission, Guidelines Manual, Annotated 2021 Chapter 6 - Sentencing Procedures, Plea Agreements, And Crime Victims' Rights explains:[12]

---

[11]   "Thousands storm Capitol as GOP takes action," <u>Wisconsin State Journal</u>, March 10, 2011, updated February 19, 2015, ("Thousands of protesters rushed to the state Capitol Wednesday night, forcing their way through doors, crawling through windows and jamming corridors"), accessible at: https://madison.com/wsj/news/local/govt-and-politics/thousands-storm-capitol-as-gop-takes-action/article_260247e0-4ac4-11e0-bfa9-001cc4c03286.html

[12]   https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-6

Commentary

Although lengthy sentencing hearings seldom should be necessary, ***disputes about sentencing factors must be resolved with care***.  When a dispute exists about any factor important to the sentencing determination, ***the court must ensure that the parties have an adequate opportunity to present relevant information.***  Written statements of counsel or affidavits of witnesses may be adequate under many circumstances.  See, e.g., United States v. Ibanez, 924 F.2d 427 (2d Cir. 1991).  ***An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues***.  See, e.g., United States v. Jimenez Martinez, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); United States v. Roberts, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity); see also, United States v. Fatico, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), cert. denied, 444 U.S. 1073 (1980).  The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.

In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial.  See 18 U.S.C. § 3661; see also United States v. Watts, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); Witte v. United States, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution); Nichols v. United States, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction).  Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.  Watts, 519 U.S. at 157; Nichols, 511 U.S. at 748; United States v. Zuleta-Alvarez, 922 F.2d 33 (1st Cir. 1990), cert. denied, 500 U.S. 927 (1991); United States v. Beaulieu, 893 F.2d 1177 (10th Cir.), cert. denied, 497 U.S. 1038 (1990).  Reliable hearsay evidence may be considered.  United States v. Petty, 982 F.2d 1365 (9th Cir. 1993), cert. denied, 510 U.S. 1040 (1994); United States v. Sciarrino, 884 F.2d 95 (3d Cir.), cert. denied, 493 U.S. 997 (1989).  Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means.  United States v. Rogers, 1 F.3d 341 (5th Cir. 1993); see also United States v. Young, 981 F.2d 180 (5th Cir.), cert. denied, 508 U.S. 980 (1993); United States v. Fatico, 579 F.2d 707, 713 (2d

Cir. 1978), <u>cert. denied</u>, 444 U.S. 1073 (1980).  Unreliable allegations shall not be considered.  <u>United States v. Ortiz</u>, 993 F.2d 204 (10th Cir. 1993).

*Id. (emphases added).*

For prosecutors, winning and losing is measured by the pursuit of justice.  It is generally reported that the inscription above the entrance to the Old Bailey courthouse states "The Crown Never Loses when Justice is Done."  Prosecutors while enjoying many advantages such as nearly limitless government resources, must also meet more compelling and strict burdens than usual for attorneys in other context:

In *Berger v. United States*, Justice George Sutherland, who was part of the Schechter majority, said the following about ***the role of the prosecutor:***

**[He] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.** [7]

*Bennett L. Gershman, "Hard Strikes and Foul Blows:" Berger v. United States 75 Years After, 42 Loy. U. Chi. L. J. 177, 179 (2010).* Available at: http://lawcommons.luc.edu/luclj/vol42/iss1/8 (citing to *Berger v. United States*, 295 U.S. 78, 88 (1935) (*emphases added*).

Perhaps even more compelling:

Also, there is little doubt that Justice Sutherland's articulation of the special obligation of the prosecutor to ensure that "justice shall be done" was influenced by then-Canon 5 of the Canons of Professional Ethics of the American Bar Association, which stated:

**"The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of**

**facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible."**

*Gershman,* at 194 *(emphasis added).*


Dated:  January 9, 2023      RESPECTFULLY SUBMITTED
                    SHAWN BRADLEY WITZEMANN,
                    *By Counsel*

                    John M. Pierce, Esq.

                    John Pierce Law Firm
                    21550 Oxnard Street
                    3rd Floor, PMB #172
                    Woodland Hills, CA 91367
                    Tel: (213) 400-0725
                    Email: *jpierce@johnpiercelaw.com*
                    Attorney for Defendant

38

## <ins>CERTIFICATE OF SERVICE</ins>

I hereby certify that this document is being filed on this December 16, 2022, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

> Christopher D. Amore, Esq.
> Assistant United States Attorney
> U.S. Attorney's Office for the District of Columbia
> Capitol Breach Detailee
> 970 Broad Street, Suite 700
> Newark, New Jersey 07102
> Telephone:  (973) 645-2757
> **Christopher.Amore@usdoj.gov**

> _____
> John M. Pierce, Esq.